FILED

98 SEP 30 PM 1: 19

U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| JERRY CURTIS BENTLEY, by and through his next friends STEVEN and MARTHA BENTLEY; | ) ) ) | |
| PLAINTIFFS, | ) | |
| VS. | ) | CV97-H-2419-NE |
| LIMESTONE COUNTY BOARD OF EDUCATION; STEVE PETTUS, individually; STAN DAVIS, individually | ) ) ) ) | |
| DEFENDANTS. | | |

ENTERED

SEP 3 0 1998

**FINAL JUDGMENT PURSUANT TO RULE 54(b)**

In accordance with the memorandum of decision this day
entered, the March 27, 1998 motion by defendants Steve Pettus and
Stan Davis for summary judgment is GRANTED.  The court concludes
that Pettus and Davis are entitled to qualified immunity in
relation to plaintiff's § 1983 claims as a matter of law and
judgment in their favor is ENTERED.  The April 29, 1998 motion by
Limestone County Board of Education for summary judgment is
GRANTED as to plaintiff's Title VI claim and is GRANTED as to
plaintiff's § 1983 equal protection claim and judgment in favor
of the Board is ENTERED as to those claims. The Board's motion
is DENIED as to plaintiff's § 1983 First Amendment claim.
Defendants' motions for summary judgment are GRANTED in relation
to plaintiff's request for all injunctive relief.  The court
concludes that no material issues of fact remain as to the Title
VI claim, the § 1983 equal protection claim against the Board
and the § 1983 claims against defendants Pettus and Davis.

/01

Defendants Pettus and Davis are DISMISSED as party defendants.

After weighing considerations of judicial economy and equitable concerns, the court concludes that there is no just reason for delaying the entry of this order as a final judgment. Fed. R. Civ. P. 54(b). The court DIRECTS the clerk to enter this order as a final judgment as to: (1) plaintiff's Title VI claim; (2) plaintiff's § 1983 claim based on equal protection against the Limestone County Board of Education; and (3) plaintiff's § 1983 claims against defendants Steve Pettus and Stan Davis. The reasons for the court's Rule 54(b) certification are set forth in the accompanying memorandum of decision.

At this time the court has not treated its decision to deny the Board's motion for summary judgment on the § 1983 First Amendment claim as final. However, should plaintiff decide to appeal any of the final decisions in favor of the Board, the court may reconsider the issue and entertain an argument to render the denial as final to allow a cross-appeal by the Board.

Presently, the only remaining claim in this case is plaintiff's § 1983 claim against the Limestone County Board of Education based on deprivation of his First Amendment freedom of association.

DONE this ___30th___ day of September, 1998.


_____
SENIOR UNITED STATES DISTRICT JUDGE

2

FILED

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

98 SEP 30 PM 1: 15

U.S. DISTRICT COURT
N.D. OF ALABAMA

JERRY CURTIS BENTLEY, by and      )
through his next friends
STEVEN and MARTHA BENTLEY;        )

    PLAINTIFFS,                  )

VS.                               )        CV97-H-2419-NE

LIMESTONE COUNTY BOARD OF         )
EDUCATION; STEVE PETTUS,
individually; STAN DAVIS,         )
individually
                                  )

    DEFENDANTS.

ENTERED

SEP 3 0 1998

## MEMORANDUM OF DECISION

There are motions for summary judgment now pending in the
above styled action.  Defendants Pettus and Davis filed their
motion for summary judgment on March 27, 1998.  Then on April 29,
1998 defendant Limestone County Board of Education (the "Board")
filed its own motion for summary judgment.  The court deemed the
motions for summary judgment as submitted for decision on May 28,
1998, in response to plaintiff's motion for an extension of time
to respond to the motion for summary judgment by Pettus and
Davis.  See April 2, 1998 Order; May 4, 1998 Order.

Defendants Pettus, Davis and the Board submitted a brief and
evidence in support of the motions for summary judgment.[1]

---

[1]  Pettus and Davis submitted excerpts from the depositions
of Jerry Curtis Bentley ("Curt") and Steven Bentley in support of
its motion on March 27, 1998 and again on May 7, 1998.  Defendant
the Board submitted on May 6, 1998 the depositions of Curt
Bentley, Steven Bentley and Martha Bentley, along with the 1997-
98 Limestone County Student Handbook, in support of its motion
for summary judgment.

100

Plaintiff submitted evidence in opposition to the motions for summary judgment on May 21, 1998.[2]  On May 28, 1998 plaintiff also submitted a brief in opposition to the motions for summary judgment.  Defendants moved to strike most of plaintiff's evidentiary submissions.  The court has considered the defendants' motions to strike and ruled on these motions by a separate order.  In considering the motions for summary judgment, the court will rely on only those portions of the plaintiff's evidentiary submissions that have withstood defendants' challenges.

Plaintiff Jerry Curtis Bentley ("Curt" or "plaintiff") initiated this action on September 9, 1997 by filing a complaint alleging that defendants deprived plaintiff of his Constitutional rights under 42 U.S.C. § 1983 and violated Title VI by discriminating against plaintiff based on his race.[3]  On October 27, 1997 this court granted in part defendants' motions to dismiss and disposed of all claims except for plaintiff's § 1983 claim against defendants the Board, Pettus, individually and

---

[2]  On May 21, 1998 plaintiff submitted eleven affidavits, three editions on the Limestone County Student Handbook and the depositions of defendants Pettus and Davis, in their entirety.

[3]  The original complaint listed Curt's father, Steven Bentley, as his next friend.  On September 24, 1997 plaintiff amended his complaint to add his mother Martha Bentley as a next friend and to include a separate cause of action by Steven and Martha Bentley, on their own behalf, for violation of their constitutional right to direct the upbringing of their minor child along with possible state law claims.  See Amended Complaint at ¶ 27.  Plaintiff also asserted state law claims against all defendants and sued defendants Pettus and Davis in their official capacities.

2

Davis, individually and plaintiff's Title VI claim against the Board, absent any punitive damage claim. These remaining claims are now being challenged by defendants' summary judgment motions.

## I.  FACTUAL BACKGROUND

Plaintiff Jerry Curtis Bentley ("Curt") attended Elkmont High School ("Elkmont") until May of 1997. <u>See</u> Curt Bentley's Affidavit at ¶ 2.  Elkmont is part of the Limestone County School System.  Thus, Elkmont students and faculty are under the supervision of the Limestone County Board of Education (the "Board").[4]  <u>See</u> Ex. M of Plaintiff's Submission, at 1; Amended Complaint at ¶ 22; Answer of Board at ¶ 1.  During the 1995-96 and 1996-97 school year, defendant Steve Pettus served as Elkmont's principal with Stan Davis serving as the vice principal.

The following facts are construed in the light most favorable to plaintiff.  Although defendants dispute these facts, the court will accept plaintiff's version of these events for purposes of considering the summary judgment motions.  In early 1996 Davis asked plaintiff "why [he] acted like a Nigger."[5]  <u>See</u>

---

[4]   The evidence submitted does not set forth the role and responsibilities of the Limestone County Superintendent of Education (the "Superintendent") generally or in connection with the allegations in this case.  The Superintendent is not named as a defendant in this action.

[5]   Another student Brian Courson also testified that during the 1996-97 school year when he was in the principal's office for a disciplinary matter **Pettus** told Courson that he "acted like a black person."  <u>See</u> Courson Affidavit.  Defendant Davis denies making the alleged statement to plaintiff.  <u>See</u> Davis depo. 28-

3

Curt Bentley depo. 93; Curt Bentley Affidavit at ¶ 3. At the homecoming dance in 1996 plaintiff danced with both black females and white females. See Curt Bentley depo. 173-74. Davis referred to the plaintiff as "the dancing king." Id. Plaintiff believed that Davis made this statement because plaintiff danced with black students. Id. No one from Elkmont or the Board ever told plaintiff with whom he could and could not dance. Id. at 181.

In October of 1996 Davis called plaintiff's mother, Martha Bentley, and told Mrs. Bentley that plaintiff had been dancing with a black female at the homecoming dance.[6] See Martha Bentley Affidavit at ¶ 3. During this same telephone conversation Davis told Mrs. Bentley something to the effect that Curt was "acting like something that he was not." Id. When Mrs. Bentley asked if Davis meant a "wannabe" Davis responded by saying "exactly."[7]

---

29. Plaintiff also testified that Pettus referred to him and his friends as "a bunch of filth." See Curt Bentley depo. 132. However, plaintiff admitted that the phrase "filth" was not "racial." Id. at 133.

[6] Martha Bentley admitted in her deposition that Davis never told her directly that he had difficulty with Curt dancing with a black female, but based on the conversation she knew that Davis did not like the fact. See Martha Bentley depo. 25-26. Davis never told Mrs. Bentley that he was going to take any disciplinary action against Curt as a result of him dancing with a black female. Id. Defendant Davis denies that any such conversation occurred. See Davis depo. 28.

[7] In her deposition Martha Bentley acknowledged that there was nothing racial about Davis' statement that Davis was going to allow Curt to do office work for him and try to steer Curt in the right direction. See Martha Bentley depo. at 23 (Attached to Motion to Strike). Although plaintiff attaches a particular meaning to the terms "wannabe" and "dancing king," he fails to point to any evidence indicating the terms' meanings. While the court could possibly infer the meanings proposed by plaintiff based on the context of this case, the terms' intended meanings

4

Id.

Also in the Fall of 1996 Davis called plaintiff's mother, Martha Bentley, and told her that Curt had been walking down the hall with his arm around Gerald Jones, a black male student.  See Martha Bentley Affidavit at ¶ 4.  Davis told Mrs. Bentley that one of plaintiff's parents had to come to the school.  Id.  Curt's father, Steven Bentley, saw on the caller identification box that someone had called from Elkmont, then went to Elkmont and was sent directly to Pettus' office by the secretary.  See Steven Bentley Affidavit at ¶ 3.  Davis told Steven Bentley that Curt had his arm around a black male walking down the hall.[8]  Id.

According to plaintiff, Gerald Jones (the black male student involved) was one of plaintiff's "best friends" and they had been friends for many years.  See Curt Bentley Affidavit ¶ 5. Plaintiff testified that he and his white friends rested their arms on each other's shoulders all the time while walking down the halls at Elkmont and they were never reprimanded or had parents called to the school.  See Curt Bentley Affidavit ¶ 5.

During Steven Bentley's meeting with Pettus, Davis joined the meeting and told Steven Bentley that Curt had danced with a black female at the homecoming dance.[9]  Pettus said to Steven

---

are not obvious on their face.  Therefore, plaintiff has not shown these statements to be "racial" slurs or epithets.

[8]  According to plaintiff, in reality Gerald Jones actually rested his arm on plaintiff's shoulder.  See Curt Bentley Affidavit ¶ 5.

[9]  Pettus denies making any such statement.  See Pettus depo. 47-48.

Bentley: "Frankly, we are not going to put up with this up here."
<u>See</u> Steven Bentley Affidavit at ¶ 4.  Both Pettus and Davis went
on the tell Steven Bentley how Curt was "hanging with black
students."  <u>Id.</u>  Davis said to Steven Bentley "I'm sick of Curt."
<u>Id.</u>  Then Pettus said "I'm sick of the way he's acting, too.
Everywhere he goes he's hanging out with blacks."[10]  <u>Id.</u>

Plaintiff was suspended from the first game of the Elkmont
1997 basketball season for cheating on a test.  <u>See</u> Curt Bentley
depo. 141.  After this first basketball game ended plaintiff went
onto the floor and began jumping up to touch the basketball
goal's rim.  <u>Id.</u>  Students from the rival team, T.M. Rogers, had
been jumping up and touching the rim.  <u>Id.</u>  A crowd of people
gathered to watch plaintiff jump.  <u>Id.</u>  On Monday when plaintiff
returned to school Davis suspended him for another basketball
game.  <u>Id.</u> at 141-42, 145.  Plaintiff was told that he was
suspended because he was drawing a crowd.  <u>Id.</u> at 142.

In February of 1997, plaintiff walked into a school dance
with Tavaris Graves, a black male.  <u>See</u> Curt Bentley Affidavit ¶
7.  Pettus told plaintiff and Graves to leave.  <u>Id.</u>; Norwood
Affidavit ¶ 4.  Pettus made Curt and Graves leave before they had
time to talk to anyone.  <u>See</u> Norwood Affidavit ¶ 4.  A fellow
student David Norwood stated that to his knowledge neither Curt
nor Graves were misbehaving or causing problems.  <u>Id.</u>  Then

---

[10]  During his deposition Pettus denies making this
statement as well.  <u>See</u> Pettus depo. 51.

6

Pettus made a big scene and told plaintiff and Graves to go out and come back in.  See Curt Bentley Affidavit ¶ 7.

Plaintiff and another student, David Norwood, went to the band room in February of 1997.  See Curt Bentley Affidavit ¶ 6; Norwood Affidavit ¶ 3.  When they arrived in the band room Pettus began screaming at plaintiff in front of the class.  Id.  Pettus demanded an explanation as to why plaintiff was not in class and said he was "tired of Curt roaming the halls."  See Norwood Affidavit ¶ 3.  Pettus did not say anything to Norwood.  Id.; Curt Bentley Affidavit ¶ 6.

Plaintiff also alleges two incidents of discriminatory enforcement of the dress code.  Near the end of the 1996-97 school year plaintiff and other white males, all wearing sleeveless shirts, were standing in the hall at Elkmont.  See Curt Bentley Affidavit ¶ 8; Heath Davis Affidavit ¶ 3.  Davis approached plaintiff, screamed at him and sent him to Davis' office for violating the dress code.[11]  Id.  Davis called Mrs. Bentley to report that Curt was wearing a sleeveless shirt at school that day and that boys could not wear sleeveless shirts because some of the boys had tatoos that would show.  See Martha Bentley Affidavit ¶ 5.  According to Martha Bentley, Davis sounded angry on the phone.  Id.  Davis then told Mrs. Bentley

---

[11]   The dress code established by the Board prohibits the wearing of tank tops.  See Plaintiff's Evid. Submission, Ex. M, at 27.  Davis did not confront the other boys wearing sleeveless shirts at that time.  See Heath Davis Affidavit; Roberts Affidavit.  However, later that day teachers made the other boys change shirts.  See Heath Davis Affidavit; Curt Bentley depo. 117.

7

that she would have to bring Curt another shirt.  Id.  Steven
Bentley called Elkmont and talked to Davis.  See Steven Bentley
Affidavit ¶ 5.  Davis told Steven Bentley that Curt had the
option of going home to get a shirt, or Steven Bentley could
bring him a shirt.  Id.  Steven Bentley took another shirt for
Curt to Elkmont.  Id.  Davis made plaintiff sit in his office
until his father arrived with another shirt and plaintiff was not
allowed to go to class until he changed his shirt.  Id.

Curt also wore "wind pants" or "wind breakers" or "see-
through white pants" to school without any shorts covering his
underwear.  See Curt depo. 124-26.  Curt admitted in his
deposition that these pants were in violation of the dress code.
Id. at 124.  Davis called Curt to the office and made Curt put on
shorts under the pants so that his underwear could not be seen.
Id. at 130.  Plaintiff went to a teacher, Coach Britton, where he
was given shorts to wear under the wind pants and allowed to
continue wearing the wind pants for the day.  Id.  Curt testified
that another student Todd Smith wore the same type of pants and
was not reprimanded.  See Curt depo. 124, 127.  A third student,
Matt Roberts, also stated in his affidavit that he wore "wind
pants" the same day that Curt was wearing wind pants.  See
Roberts Affidavit.  According to Roberts, while Curt was sent to
the office for punishment, no action was taken against Roberts.[12]

---

[12]   The evidence fails to indicate the race of Todd Smith
and Matt Roberts or whether they "hang out" with students of a
different race.  Additionally, the evidence does not indicate
whether Roberts or Smith wore any shorts under their "wind pants"
to cover their underwear.

Id.

At the conclusion of the 1996-97 school year Curt failed the eleventh grade at Elkmont.  Plaintiff asserts that he lost interest in school because he knew that defendants Pettus and Davis did not like him because of his black friends and Pettus often looked at plaintiff with a "frown of disgust."  <u>See</u> Curt Bentley depo. 131-32; Curt Bentley Affidavit ¶ 9.  According to plaintiff, his self-esteem was shattered and he suffered from frequent migraine headaches as a result of the treatment by Pettus and Davis.  <u>See</u> Curt Affidavit.  However, plaintiff admitted that prior to these incidents he made a lot of "D's" and "F's."  <u>See</u> Curt Bentley depo. 194-95.

In the summer of 1997, plaintiff attended summer school for only one day before quitting.  <u>See</u> Curt Bentley depo. 52-55.  According to plaintiff, he quit summer school because he wanted to get a job, he remembered how long the days of summer school were and he did not know where he was going to school the next year.  Id.

In the fall of 1997-98 plaintiff attended Athens High School.  Curt's father, Steven Bentley, rented an apartment in Athens where he and Curt lived in order for Curt to be eligible to attend Athens High School.  Plaintiff testified that he continued to suffer from migraine headaches while attending Athens High School.  <u>See</u> Curt Bentley depo. 63. In late September of 1997, plaintiff withdrew from Athens High School following a disciplinary incident.

## II.   LEGAL ANALYSIS

### A.   Summary Judgment Standard

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).   The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings, which it believes demonstrate the absence of a genuine issue of material fact.   Celotex, 477 U.S. at 323.   Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial.   Celotex, 477 U.S. at 324.

The substantive law will identify which facts are material and which are irrelevant.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).   A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.   If the evidence is merely colorable,

10

or is not significantly probative, summary judgment may be granted. Id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. Fitzpatrick, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of

11

evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  <u>Fitzpatrick</u>, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  <u>Lewis v. Casey</u>, 518 U.S. 343 (1996).

Plaintiff alleges that defendants deprived him of his First Amendment right of association and his Fourteenth Amendment right of equal protection.  Plaintiff also alleges that the Board discriminated against him because of his race in violation of Title VI.  Defendants Pettus and Davis summarily argue that plaintiff's claim of disparate treatment based on an interracial relationship is not a claim of race discrimination.  <u>See</u> Defendants' Brief at 17.  However, the Eleventh Circuit has recognized that under Title VII and § 1981 "[w]here a plaintiff claims discrimination based upon an interracial marriage or

12

association, he alleges, by definition, that he has been discriminated against because of his race." <u>Parr v. Woodmen of the World Life Insurance Co.</u>, 791 F.2d 888, 892 (11th Cir. 1986). The court sees no reason why this rationale would not equally apply in to plaintiff's § 1983 equal protection and Title VI claims.

### B.   **Title VI Claim Against The Board**

Plaintiff asserts that the Board discriminated against Curt based on his race in violation of Title VI of the Civil Rights Act, 42 U.S.C. § 2000d.  Title VI provides that "[n]o person in the United States shall, on the ground of race,. . .be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  Congress included Title VI as a provision in the Civil Rights Act of 1964 based at least in part on its concern with the lack of progress in school desegregation.  <u>Green v. County School Board of New Kent County</u>, 391 U.S. 430, 435, n.2 (1968).  In this case plaintiff alleges that the Board is liable under Title VI for a racially hostile environment at Elkmont because it knew or should have known of the racially discriminatory conduct by Pettus and Davis.  <u>See</u> Amended Complaint at ¶ 21.

Due to the parallel nature of Title VI and Title IX, 20 U.S.C. § 1618 *et seq.,* courts have routinely applied rationale under one of these statutes to actions brought under the other

13

statute.   <u>Cannon v. University of Chicago</u>, 441 U.S. 677, 694

(1979); <u>Davis v. Monroe County Bd. Of Educ.</u>, 120 F.3d 1390, 1398

(1997).   Recently the United States Supreme Court clarified the

legal standard for liability under Title IX in relation to local

school districts.   <u>Gebser v. Lago Vista Indep. School Dist.</u>, 118

S. Ct. 1989 (1998).   In <u>Gebser</u>, the Supreme Court acknowledges

that as a result of Title IX being modeled after Title VI, the

two statutes are parallel except that Title IX prohibits sex

discrimination while Title VI prohibits race discrimination and

Title VI applies to all programs receiving federal funds, rather

than just educational programs.   118 S. Ct. at 1997.   "The two

statutes [Title VI and Title IX] operate in the same manner,

conditioning an offer of federal funding on a promise by a

recipient not to discriminate, in what amounts essentially to a

contract between the Government and the recipient of funds."   <u>Id.</u>

(other citations omitted).

In <u>Gebser</u> the Supreme Court held that absent proof of an

official policy by the school district, an individual has <u>no</u>

damage remedy under Title IX "unless an official who at a minimum

has authority to address the alleged discrimination and to

institute corrective measures on the school district's behalf has

actual knowledge of discrimination in the school district's

programs and fails adequately to respond."[13]   <u>Id.</u> at 1999.

---

[13] This rationale does not render Title IX or Title VI
meaningless.   <u>Floyd v. Waiters</u>, 133 F.3d 786, 792 (11th Cir.
1998).   "School superintendents and school board members are
local public officials to whom letters are easily sent and who
often appear at public meetings and receive constituent phone
calls.   They can -- for example, by reasonable efforts of parents
and student -- be put on notice of misconduct.   If the
superintendent or school board then does nothing, the school

14

Liability under Title IX cannot be based solely on principles of vicarious liability or constructive notice, i.e., that the school district "should have known" about the alleged discriminatory conduct. Id. at 1998. The Eleventh Circuit more distinctly described the standard in these terms:

> As we understand Title IX, we believe the school district can be liable only for the school district's own acts or omissions: institutional misconduct is the basis for institutional liability. So, we cannot agree that notice of [the alleged discriminatory conduct] can be imputed to the school district - that is, the kind of notice that triggers the necessity for the school district's leaders to act or else the district will be held liable for violating Title IX -whenever a [discriminating] employee's supervisor, with the authority to take action to end such [conduct], has knowledge of the harassment.

Floyd v. Waiters, 133 F.3d 786, 790 (11th Cir. 1998)(footnote omitted) (other citations omitted). Both Gebser and Floyd involved allegations essentially amounting to a hostile environment sexual harassment claim.[14] Therefore, plaintiff's argument that constructive knowledge is sufficient in this case due to the hostile environment claim is unpersuasive. The court concludes that the Supreme Court's rationale in Gebser and the Eleventh Circuit's analysis in Floyd are equally applicable to Title VI and to the facts of this case.

The undisputed facts in this case demonstrate that plaintiff has failed to create any issue of fact as to whether the Board had actual knowledge of the alleged discriminatory conduct

_____

district can be liable." 133 F.3d at 792.

[14] The plaintiff in Floyd alleges more serious wrongdoing, including assault and rape. 133 F.3d 786 (1998).

15

involving Curt Bentley.  Curt's mother, Martha Bentley, testified that she never spoke with either the Superintendent or any member of the Board concerning the allegations in this action.  See Martha Bentley depo., 18, 58.  Likewise, both the plaintiff and his father, Steven Bentley, testified that they never spoke to any members of the Board concerning the allegations in this action.  See Curt depo. 185, 187; Steven Bentley depo. 88.  Plaintiff has presented no evidence indicating that any member of the Board or the Superintendent was notified of the complaints that serve as the basis of this action.  Therefore, defendant is entitled to summary judgment in its favor on plaintiff's Title VI claim unless he can present sufficient evidence of a discriminatory policy by the Board.

In the amended complaint the only policy challenged is that of allowing Pettus and Davis to act in a racially discriminatory manner in their oversight of a wide variety of matters involving student life at Elkmont, including extracurricular activities and student discipline, due to the final policymaking authority delegated by the Board.[15]  See Amended Complaint at ¶ 9.

_____

[15]  The nature of the allegations in the complaint indicate that plaintiff is seeking relief under Title VI based on intentional discrimination relating to actions by Pettus and Davis.  This case does not appear to include any disparate impact claim due to the absence of any allegations for violation of regulatory provisions and the failure to allege any claims in terms of disparate impact.  See Elston v. Talladega Co. Bd. Of Educ., 997 F.2d 1394, 1406 (11th Cir. 1993); Godby v. Montgomery Co. Bd of Educ., 996 F. Supp. 1390 (M.D. Ala. 1998); Sandoval v. Hagan, 7 F. Supp. 2d 1234 (M.D. Ala. 1998).  The regulations set forth in plaintiff's brief were provided as support for the imposing of hostile environment liability and not alleging specific violations.  See Plaintiff's May 28, 1998 Brief; p.14-

16

Although these allegations may be sufficient to withstand summary judgment on plaintiff's § 1983 claim due to the possibility that Pettus and Davis may be considered final policymakers in certain areas, see Pembaur v. City of Cincinnati, 475 U.S. 469, 475 (1986), the court concludes that this broad allegation of policy is insufficient to provide the missing element of actual notice necessary in a Title VI claim.

The Supreme Court in Gebser appears to limit its holding to cases "that do not involve official policy of the recipient entity." 118 S. Ct. at 1999. It would be reasonable to assume that evidence of actual notice could be established were plaintiff to present proof that there was a discriminatory policy officially sanctioned by the Board or Superintendent or alternatively a discriminatory custom that either the Board of Education or Superintendent were aware of but failed to adequately respond. However, as discussed more fully below, plaintiff has presented no such proof. Thus, the court is left with the dilemma of determining whether evidence that Pettus and Davis may be final policymakers in certain instances is sufficient to create Title VI liability.

In Gebser and Floyd v. Waters, 133 F.3d 786, 790 (11th Cir. 1998), the basis for liability under Title IX rests on the school district's own actions following actual notice of discriminatory

---

16.   Even assuming that plaintiff might be entitled to prospective relief under Title VI, such recovery is not appropriate in this case based on the fact that plaintiff is no longer a student at Elkmont.  City of Los Angeles v. Lyons, 461 U.S. 95, 111 (1983).

17

conduct and not the action of an employee. The Supreme Court stated that "[a]s a general matter, it does not appear that Congress contemplated unlimited recovery of damages against a funding recipient where the recipient is unaware of discrimination in the program." Gebser, 118 S. Ct. at 1997. In Guardian Ass'n v. Civil Serv. Comm'n of New York City, 463 U.S. 582, 598 (1983), the Supreme Court concluded that relief under Title VI alleging unintentional discrimination should be prospective only, because where discrimination is unintentional "it is surely not obvious that the grantee was aware that it was administering the program in violation of the [condition of the contract with the government]." Based on this rationale, the court concludes that absent proof that the Board of Education or Superintendent had actual notice of the alleged discriminatory actions by Pettus and Davis, even if such actions constitute actions by final policymakers, they are insufficient to create any liability for damages under Title VI.

Relying on the analysis in Floyd v. Waters, it would appear that under state law the Limestone County Superintendent of Education is the party designated responsibility for the school district's compliance with statutory obligations, such as Title VI. *Ala. Code* § 16-9-13; 133 F.3d at 791. Section 16-9-13 provides as follows: "The county superintendent of education, as the executive officer of the county board of education, shall see that the laws relating to the schools, the rules and regulations of the state and county boards of education are carried into

18

effect. . ."  Plaintiff has presented no evidence that
responsibility for compliance with Title VI has been delegated to
anyone below the Board of Education or more specifically to
anyone other than the Superintendent.[16]  Absent proof that the
Superintendent, the Board, or the person delegated compliance
responsibility had actual knowledge of the alleged discriminatory
conduct by Pettus and Davis, the court concludes that any
recognition of potential liability by the Board would contravene
the purpose and the underlying policies of Title VI as identified
in the Title IX analysis by the Supreme Court and the Eleventh
Circuit.  Based on the foregoing defendant The Board's motion for
summary judgment as to the Title VI claim is due to be granted.

### C.  **Plaintiff's § 1983 Claim Against The Board**

In order for plaintiff to prevail on his § 1983 claim
against The Board, plaintiff must present sufficient evidence
that The Board maintained an unconstitutional policy or custom.
Monell v. New York City Dept. of Social Services, 436 U.S. 658,
690 (1978).  The amended complaint alleges the existence of a
Board policy of delegating to principals and vice-principals
final policymaking authority in student matters, such as
extracurricular activities and discipline.  See Amended Complaint
¶ 9.  Plaintiff alleges that "pursuant to this delegation of

---

[16]   The court notes that the Student Handbook lists persons
who have been appointed to coordinate compliance efforts in other
areas, such as, Title IX, Section 504/ADA, and IDEA.  See
Plaintiff's Ex. M, p.41.

final policymaking authority defendants Steve Pettus and Stan
Davis have adopted and carried out a policy or practice of acting
in a racially discriminatory manner by discouraging interracial
associations and relationships at Elkmont High School."  Id. at ¶
10.  The evidence before the court fails to indicate any
discriminatory policy officially sanctioned by the Board of
Education or evidence of any discriminatory custom that was known
by the Board and then the Board failed to take action to stop the
custom.[17]  Floyd v. Waters, 133 F.3d 786, 793-95 (11th Cir. 1998).
Thus, the only way that plaintiff can prevail on a § 1983 claim
against the Board is to demonstrate that defendants Pettus and
Davis were final policymakers in the controversial areas.

### 1.   FINAL POLICYMAKING AUTHORITY BY PETTUS AND DAVIS

A local officer who has "final policymaking authority" in a
certain area of the local governing body's business may by his
action subject the governing body to § 1983 liability.  Pembaur
v. City of Cincinnati, 475 U.S. 469, 475 (1986);  Brown v. City
of Fort Lauderdale, 923 F.2d 1474, 1480 (11th Cir. 1991).   In
other words, if Pettus and Davis are found to be final
policymakers in the areas where the alleged discrimination

---

[17]   The only arguable evidence of a discriminatory custom
presented are the affidavits by former students that Davis or
Pettus made racially offensive statements to them or discouraged
and allegedly interfered with interracial dating.  See Cross
Affidavit; Lankford Affidavit; Crutcher Affidavit.  This evidence
falls far short of proving custom when coupled with the absence
of any evidence to prove that the Board of Education knew that
such practices were occurring.

20

occurred then their actions may subject the Board to § 1983
liability.  <u>Pembaur</u>, 475 U.S. at 480.  Pettus admitted in his
deposition that the local school makes decisions relating to
school dances, with the principal being the decision maker.  <u>See</u>
Ex. O of Plaintiff's Submission, p.19.

However, "not every decision by municipal officers
automatically subjects the municipality to § 1983 liability . . .
The fact that a particular officer - even a policymaking official
- has discretion in the exercise of particular functions does
not, without more, give rise to municipal liability based on an
exercise of that discretion."  <u>Pembaur</u>, 475 U.S. at 480-81.
"[L]iability results when the 'municipal official possessed the
authority and responsibility for establishing *final* policy with
respect to the issue in question.'"  <u>Floyd v. Waiters</u>, 133 F.3d
786, 794 (11th Cir. 1998)(quoting <u>Mandel v. Doe</u>, 888 F.2d 783,
793 (11th Cir. 1989))(emphasis in original).  "[T]he delegation
must be such that the subordinate's discretionary decisions are
not constrained by official policies and are not subject to
review."  <u>Mandel v. Doe</u>, 888 F.3d 783, 792 (11th Cir. 1989)
(citations omitted).  The issue of whether a particular local
official has final policymaking authority is a question of state
law that is to be decided by this court.  <u>Floyd v. Waiters</u>, 133
F.3d at 794.

The Board argues that it had in place a structured
discipline code which applied to all schools within the county
school system.  <u>See</u> Exhibit M to Plaintiff's Evidentiary

21

Submission.[18]  In the brief the Board states that "parents having grievances with any given punishment may request to be heard at the next meeting of the Board by asking to be placed on the Board's agenda."  See April 29, 1998 Brief at p.4.  Clearly the Limestone County Student Handbook provides for a hearing by the Board in a case where the student is suspended for more than five school days, expelled or has excessive absences.  See Ex. M, p. 16, 35 & 39.  However, with the lesser forms of discipline the Student Handbook includes no express procedure or right for review by the Board.

The Board argues that "any act that results in punishment by the principal or assistant principal of a school within the county system i[s] discipline within the parameters of the disciplinary code provided by the Board."  See April 29, 1998 Brief at p.4-5.  Accordingly, the Board argues that it is the final policymaker and provides meaningful administrative review of actions by Pettus or Davis.  Id.

"[A] municipal official does not have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review."  Scala v. City of Winter Park, 116 F.3d 1396, 1401 (11th Cir. 1997); Morro v. City of Birmingham, 117 F.3d 508, 514 (11th Cir. 1997).  In Morro, the Eleventh Circuit looked to the City's

_____

[18]  Defendant The Board cites to the 1997-98 version of the Student Handbook, but the more appropriate source is the edition in effect during the events in question, i.e. the 1996-97 edition provided by plaintiff.  See Ex. M of Plaintiff's Evid. Sub.

22

governing regulations and evidence of the City's actual practices to determine whether the Police Chief or the Jefferson County Personnel Board was the final policymaker.  117 F.3d at 515.

Under Alabama law, a county board of education is vested with the responsibility for general administration and supervision of its public schools.  *Alabama Code* § 16-8-8.  As Judge Albritton points out in the <u>Godby v. Montgomery County Bd.</u> <u>Of Education</u> opinion, 996 F. Supp. 1390 (M.D. Ala. 1998), two other statutes indicate that "control" may pass below the Board of Education, but these statutes fail to establish a final policymaker in specific areas and at the same time do not proscribe such delegation.[19]  The Student Handbook is the only evidence submitted that assists in determining the final policymaker issue.  The format of the Student Handbook supports an inference that Pettus and Davis are policymakers in the challenged areas, by providing a specific review procedure in cases of suspension of more than 5 days, expulsion and excessive absences and establishing no similar procedure in these other areas.

Additionally, as plaintiff points out the Student Handbook states:  "Principals are charged with the responsibility of

---

[19]  *Alabama Code* § 16-8-9 provides that a county board of education can exercise control and supervision of the county school system through the superintendent of education and his professional assistants.  Additionally, a county superintendent of education is given the authority "as executive officer of the county board of education" to "see that the laws relating to the schools, the rules and regulations of the state and county board of education are carried into effect. . ." *Alabama Code* § 16-9-13.

general student conduct and behavior regulations." See Plaintiff's Ex. M, p.33. After the Student Handbook defines the classifications of violations it delegates certain responsibilities: "Appropriate school personnel shall investigate, verify, and take the necessary action to resolve student misconduct. After determining a violation and the classification of the violation, the principal or designee should implement the appropriate sanction." Id. p.29. While the Board maintains the policymaking authority to establish the overall dress code and classifications for disciplinary actions, the evidence fails to demonstrate that the Board of Education is an exclusive policymaker in this case.[20]

The Eleventh Circuit has recognized that lower level employees may be delegated official policymaking authority for some purposes. Parker v. Williams, 862 F.2d 1471, 1478 (11th Cir. 1989), overruled on other grounds, Turquitt v. Jefferson Co., 137 F.3d 1285 (1998). "Authority may be granted directly, or the authority may be delegated by an official having the power to do so." Parker, 862 F.2d at 1478. The court may look to the "substance of an official's authority over a particular matter, rather than the technical allocation of responsibility" to decide who has policymaking authority in a particular area. Parker, 862

---

[20]     The Alabama statutes discussed above fail to affirmatively state that the Board or the Superintendent have any exclusive rights or authority that cannot be delegated. Compare Alabama Code §§ 16-8-8; 16-8-9; 16-9-13 with Chatham Ass'n of Educators, Teacher Unit v. Board of Pub. Educ. Of City of Savannah and Chatham Co., 231 Ga. 806, 807-08, 204 S.E.2d 138 (1974).

F.2d at 1478. This reasoning allows for the possibility that Davis may be a final policymaker due to a delegation by Pettus.

The evidence before the court is inconclusive as to whether or not the Board provides meaningful administrative review of decisions by Pettus or Davis relating to disciplinary action short of a 6-day suspension or expulsion; enforcement of the dress code; and control of student's informal social conduct at school-related functions or in school.[21]  The Board has failed to come forward with sufficient evidence to demonstrate that as a matter of law disciplinary decisions (below a 6-day suspension) and regulation of general student conduct by Pettus or Davis are subject to meaningful administrative review.[22]  "The mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking

_____

[21]  Arguably, the decisions by Pettus and Davis seem less like a "policy" and more of a specific decision in relation to plaintiff's particular conduct. However, the status of the law as to whether such decisions constitute "policy" under § 1983 remains unclear.  In Pembaur the Supreme Court stated that liability may arise from "a course of action tailored to a particular situation and not intended to control decisions in later situations." 475 U.S. at 481.  However, the Eleventh Circuit has brought to light a more recent Supreme Court decision that casts some doubt on this reasoning by declining to address "[w]hether that decision was intended to govern only the situation at hand or to serve as a rule to be applied over time." See Scala v. City of Winter Park, 116 F.3d 1396, 1399,n.2 (11th Cir. 1997)(quoting Board of County Comm'rs v. Brown, ____ U.S. ___ , 117 S. Ct. 1382 (1997)).

[22]  In relation to the dress code, the Board of Education exercises the role of final policymaker with regard to what type of clothing is defined as violating the dress code.  See Plaintiff's Ex. M, p.27.  However, the claim by plaintiff is not that the dress code is discriminatory, but rather discriminatory enforcement of that policy.

authority." City of St. Louis v. Praprotnik, 485 U.S. 112, 129 (1988). Thus, the fact that the Board does not automatically review every such decision does not mean that it has delegated final policymaking authority in these areas to Pettus and Davis. Yet, in the absence of any authority for such a review, when necessary, and in the face of no evidence of a regular practice of providing this type of review at a parent's request, the Board's motion for summary judgment on plaintiff's § 1983 claim is due to be denied as to the asserted ground that Pettus and Davis do not constitute final policymakers.

### 2. SECTION 1983 VIOLATIONS ALLEGED

To further consider plaintiff's § 1983 claim against the Board, the court must now look to the alleged discriminatory conduct and determine if plaintiff properly alleged constitutional or statutory violations actionable under § 1983. Plaintiff appears to be traveling under two separate Constitutional rights, the Fourteenth Amendment equal protection right and the First Amendment right of freedom of association.

### a. Equal Protection

As to plaintiff's equal protection claim, he appears to be asserting a two-prong claim. First, he asserts that defendants' conduct amounts to segregation of the school based on race and thereby violates plaintiff's equal protection right due to the responsibilities set forth in Brown v. Board of Education, 347

U.S. 483 and <u>Brown II</u>, 349 U.S. 294 (1955). Second, plaintiff asserts that he was treated disparately based on his association with black students.

The duty of school officials to desegregate schools extended to extracurricular activities. <u>Swann v. Charlotte-Mecklenburg Bd. of Educ.</u>, 402 U.S. 1, 18 (1971). Courts overseeing the desegregation plans for schools are instructed to look to extracurricular activities as one factor in determining whether local authorities have eliminated the vestiges of de jure segregation as far as practicable. <u>Lockett v. Board of Educ. Of Muscogee Co.</u>, 111 F.3d 839, 842 (11th Cir. 1997).

However, if plaintiff is truly asserting that the actions by Pettus and Davis are actually or virtually creating a segregated student body at Elkmont, then that claim should not be part of this case but more appropriately addressed by the judge overseeing the desegregation plan for Limestone County schools. Under <u>Lee v. Macon County</u>, 70-251-S, the court permanently enjoined the Limestone County Board of Education from operating a dual system of racially identifiable schools subject to certain provisions in December of 1976. No unitary order has been issued in relation to the Limestone County system. Therefore, any assertion that a Limestone County school is violating the desegregation injunction should be addressed as a motion or petition under <u>Lee v. Macon County</u> and not in this action.

As to plaintiff's second type of § 1983 claim asserting a deprivation of his Fourteenth Amendment equal protection right,

27

the court assumes that plaintiff is basically asserting disparate treatment based on race.  See Plaintiff's Brief at 11; Marshall County Bd. Of Educ. V. Marshall Co. Gas Dist., 992 F.2d 1171, 1177 (11th Cir. 1993); Klinger v. Department of Corrections, 31 F.3d 727, 731 (8th Cir. 1994); see also Kicklighter v. Evans Co. School Dist., 968 F. Supp. 712, 720 (S.D. Ga. 1997), aff'd without opinion, 140 F.3d 1043 (11th Cir. 1998)(a student's equal protection claim based on association with friends of another race).  Plaintiff alleges several forms of disparate treatment, such as discipline, enforcement of the dress code and involvement in extracurricular activities.  Even when the facts are construed in the light most favorable to plaintiff, the actions by Pettus and Davis fail to demonstrate intentional discrimination of a constitutional magnitude.  As to discipline, the facts fail to demonstrate that plaintiff received any actual disciplinary consequences as a result of his association with black students.  At most the facts indicate that plaintiff was reprimanded by Pettus and Davis, given dirty looks by Pettus and Davis and his parents were called and conferred with about plaintiff's association with black students.  See Curt Bentley depo. 131-32, 181-82; Curt Bentley Affidavit; Martha Bentley Affidavit; Steven Bentley Affidavit.

While technically a reprimand and a parent conference is a defined disciplinary "sanction" for Class I violations in the Student Handbook, such counseling and instruction is not sufficiently severe to amount to a constitutional deprivation.

28

To the contrary, school administrators and teachers should feel free to regularly counsel students and their parents as to any matter where the school representative believes different actions or behavior is in the best interest of the student.  There is no evidence to indicate any form of sufficiently adverse results from the "discipline" dispensed by Pettus and Davis.  Had the facts of this case involved a more severe discipline such as suspension, discharge or corporal punishment, the court's holding might have been different.  Plaintiff has failed to present any evidence of disparate discipline.  The record provides no proof that other students not maintaining interracial friendships were disciplined in a different manner.[23]

Plaintiff alleges that the "disciplinary" actions by Pettus and Davis caused him to leave Elkmont and not return.  Yet plaintiff has not asserted that defendants actually prohibited plaintiff from returning to Elkmont.  The evidence fails to indicate an atmosphere at Elkmont so hostile as to elevate the conduct to an intolerable, unconstitutional situation. Plaintiff's own testimony indicates other motives for quitting school.  In the summer of 1997 plaintiff voluntarily quit summer school for reasons not related to Pettus and Davis.  See Curt Bentley depo. 52-55.  Plaintiff subsequently left Athens High School early the next Fall due to a disciplinary matter.  Id. at 69-70.  The undisputed evidence indicates that plaintiff's

---

[23]   Plaintiff offers his own opinion that he was treated differently, but that does not provide sufficient evidence of any disparate treatment.

29

failure to finish high school was not a result of defendants'
conduct.  Plaintiff has no constitutional right to attend a
particular school.  Seamons v. Snow, 84 F.3d 1226, 1234 (10th
Cir. 1996).  No issues of material fact exists as to plaintiff's
failure to finish high school.

As to the dress code, plaintiff has presented no evidence of
discriminatory enforcement.  In relation to the comparitor
identified, there is no evidence that the comparitors were
allowed to wear the same type of clothing that plaintiff was
prohibited from wearing.  See Curt Bentley depo. 117; footnote 12
*supra*.  The scant evidence of intimidation and "dirty looks" by
Pettus and Davis fail to rise to the level of discrimination.
While the court does not condone such behavior, the evidence here
is insufficient to prove a constitutional deprivation.

Plaintiff also alleges that Davis used a racial slur that
offended him when asking why plaintiff "acted like a Nigger."
See Curt Bentley depo. 93.  As a matter of law, a single racial
slur is not sufficient to state a constitutional violation or
deprivation.  See Hartsfield v. Mayer, No. 95-1411, 76 F.3d 378,
1996 WL 43541 (6th Cir. Feb. 1, 1996); Smith v. Wilkerson, No.
93-4243, 23 F.3d 408, 1994 WL 169692 (6th Cir. May 4,
1994)(unpublished opinion) (both relying on Torres v. County of
Oakland, 758 F.2d 147, 152 (6th Cir. 1978)(Title VII case)); see
also Faragher v. City of Boca Raton, ___ U.S. ___, 118 S. Ct.
2275, 2283 (1998)(Title VII).

In relation to any limitations placed on plaintiff in his

30

participation of athletics, dances and other after school
extracurricular events, the evidence indicates that plaintiff was
not totally denied access to the activities or events, but simply
challenges limits placed on his enjoyment of such activities.[24]
The court concludes that the privilege of more fully
participating in such activities or events does not derive from
the United States Constitution. Seamons v. Snow, 84 F.3d 1226,
1234 (10th Cir. 1996); Palmer v. Merluzzi, 868 F.2d 90, 96 (3d
Cir. 1989); Brenden v. Independent School Dist. 742, 477 F.2d
1292, 1297 (8th Cir. 1973).

Further, recovery through § 1983 is not available for simply
any violation of federal law, but only where a statutory
provision gives rise to a federal right. Blessing v. Freestone,
520 U.S. 329 (1997). Title VI appears to meet the three-pronged
test provided in Blessing and thus constitutes a federal right.
However, dismissal of this § 1983 claim is appropriate because
Congress created a comprehensive enforcement scheme within Title
VI that is incompatible with individual enforcement under § 1983.

_____

[24] According to plaintiff, when Pettus allegedly told
plaintiff and Tavaris Graves to leave a school dance, he stated
for them to "go out and come back in." See Curt Bentley
Affidavit ¶ 6. Therefore, the evidence does not indicate that
plaintiff was actually refused access to the dance. Although the
evidence is somewhat unclear about the substance of plaintiff's
complaints surrounding his suspension from a basketball game,
plaintiff admits in his deposition that his initial suspension
was punishment for cheating on a test followed by his second
suspension for drawing attention to himself at the game that was
the subject of his first suspension. See Curt Bentley depo. 140-
42, 145.

31

Blessing, 117 S. Ct. at 1360.[25]

The court concludes that the Board is entitled to judgment in its favor with regard to both prongs of plaintiff's equal protection claim being pursued under § 1983.

### b.  First Amendment Freedom of Association

In addition to the equal protection grounds, plaintiff also asserts that the Board deprived him of his First Amendment right of association.  The Board argues that plaintiff has failed to present evidence to indicate a deprivation of any constitutional right.  The issue before the court is whether plaintiff's alleged right to associate with black students in school or at school-related functions falls within the protections of the First Amendment right of association.  The Supreme Court has recognized this First Amendment protection in two distinct senses:

. . .In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusions by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment - speech, assembly, petition for the redress of grievances, and the exercise of religion.  The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties.

Roberts v. United States Jaycees, 468 U.S. 609, 617-18 (1983). Furthermore, the Supreme Court has stated that it does not "think

---

[25]  Even assuming that plaintiff could maintain a § 1983 claim based on rights under Title VI, his claim would still fail due to the absence of proof of actual notice to the Board.

the constitution recognizes the generalized right of social association." City of Dallas v. Stanglin, 490 U.S. 19, 25 (1989).

The facts in this case fail to demonstrate that plaintiff was seeking association with black students for the purpose of engaging in any type of protected speech, petitioning or religious exercise.[26] However, the question of whether or not plaintiff's association with black students falls within the realm of protected human relationships, is a more difficult issue. The Supreme Court has described the protection of certain personal relationships as follows:

> The Court has recognized that the freedom to enter into and carry on certain intimate or private relationships is a fundamental element of liberty protected by the Bill of Rights. Such relationships may take various forms, including the most intimate. See Moore v. East Cleveland, 431 U.S. 494, 503-504 (1977) (plurality opinion). We have not attempted to mark the precise boundaries of this type of constitutional protection. The intimate relationships to which we have accorded constitutional protection include marriage, Zablocki v. Redhail, 434 U.S. 374, 383-386 (1978); the begetting and bearing of children,

---

[26]  The Supreme Court has recognized that "[a]ccording protection to collective effort on behalf of shared goals is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority. . . implicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." Roberts v. United States Jaycees, 468 U.S. 609, 622 (1984). There are no allegations by plaintiff that his association with black students serves as a means for pursuing important social, educational or cultural matters. Based on the evidence it appears that plaintiff and other white students are learning along with black students in the same classrooms. Rather, the conduct in this case appears to involve the socializing and less structured interaction by students.

33

include marriage, Zablocki v. Redhail, 434 U.S. 374,
383-386 (1978);  the begetting and bearing of children,
Carey v. Population Services International, 431 U.S.
678, 684-686 (1977);  child rearing and education,
Pierce v. Society of Sisters, 268 U.S. 510, 534-535
(1925);  and cohabitation with relatives, Moore v. East
Cleveland, *supra*, 431 U.S., at 503-504.  Of course, **we
have not held that constitutional protection is
restricted to relationships among family members. We
have emphasized that the First Amendment protects those
relationships, including family relationships, that
presuppose "deep attachments and commitments to the
necessarily few other individuals with whom one shares
not only a special community of thoughts, experiences,
and beliefs but also distinctively personal aspects of
one's life."** Roberts v. United States Jaycees, *supra*,
468 U.S., at 619-620.  But in Roberts we observed that
"[d]etermining the limits of state authority over an
individual's freedom to enter into a particular
association ... unavoidably entails a careful
assessment of where that relationship's objective
characteristics locate it on a spectrum from the most
intimate to the most attenuated of personal
attachments."  468 U.S., at 620 (citing Runyon v.
McCrary, 427 U.S. 160, 187-189 (1976) (POWELL, J.,
concurring)).  In determining whether a particular
association is sufficiently personal or private to
warrant constitutional protection, we consider factors
such as size, purpose, selectivity, and whether others
are excluded from critical aspects of the relationship.
468 U.S., at 620.

Board of Directors of Rotary Int'l v. Rotary Club of Duarte, 481

U.S. 537, 545-46 (1987)(emphasis added).

The Court has long recognized that, because the
Bill of Rights is designed to secure individual
liberty, it **must afford the formation and preservation
of certain kinds of highly personal relationships a
substantial measure of sanctuary** from unjustified
interference by the State. . .Without precisely
identifying every consideration that may underlie this
type of constitutional protection, **we have noted that
certain kinds of personal bonds have played a critical
role in the culture and traditions of the Nation by
cultivating and transmitting shared ideals and beliefs;
they thereby foster diversity** and act as critical
buffers between the individual and the power of the
State. . .**Moreover, the constitutional shelter afforded
such relationships reflects the realization that
individuals draw much of their emotional enrichment**

34

> from close ties with others. Protecting these
> relationships from unwarranted state interference
> therefore safeguards the ability independently to
> define one's identity that is central to any concept of
> liberty.
>
> . . .Accordingly, the Constitution undoubtedly imposes
> constraints on the State's power to control the
> selection of one's spouse that would not apply to
> regulations affecting the choice of one's fellow
> employees.
>
> Between these poles, of course, lies a broad range
> of human relationships that may make greater or lesser
> claims to constitutional protection from particular
> incursions by the State.

Roberts v. United States Jaycees, 468 U.S. 609, 618-19

(1984)(other citations omitted)(emphasis added).

Prior to the Supreme Court's instructions in Roberts and

Board of Directors of Rotary, the Eleventh Circuit provided some

insight into the scope of the freedom of association.  In Wilson

v. Taylor, 733 F.2d 1539 (11th Cir. 1984), overruled on other

grounds, Scala v. City of Winter Park, 116 F.3d 1396 (1997), a

city policeman was terminated because he maintained a dating

relationship with the daughter of a convicted felon and reputed

organized crime member.  The Eleventh Circuit concluded "that

dating is a type of association which must be protected by the

first amendment's freedom of association."  Wilson, 733 F.2d at

1544.  In fact, the Eleventh Circuit stated generally "[a] state

violates the fourteenth amendment when it seeks to interfere with

the social relationship of two or more people."  Id.  The

relevant inquiry is described as simply whether the two

individuals wish to associate with one another.  Id.  However,

the strength of this holding is unclear due to the intervention

35

of the Supreme Court's reasoning in <u>Roberts</u> and <u>Board of Directors of Rotary</u>.  <u>See</u> <u>also</u>, <u>Wallace v. Texas Tech University</u>, 80 F.3d 1042, 1051-52 (5th Cir. 1996) (rejected argument that a college coach-player relationship was protected under the right of association).

The question presently before the court is whether plaintiff's relationships with friends at school are meaningfully "private" and thus worthy of constitutional protection.  In the evidence provided, plaintiff describes his relationship with Gerald Jones, the black male plaintiff had his arm around, as one of his "best friends."  <u>See</u> Curt's Affidavit.  Plaintiff and Jones had been friends for eight years or more.  <u>Id.</u>  The facts fail to provide any specific details about plaintiff's relationship with Shienika Oliver, the black female he danced with at the homecoming dance, and Tavaris Graves, the black male he arrived with at a school dance.  <u>Id.</u>  It appears that at a minimum these individuals were fellow students who plaintiff knew personally in a more familiar manner than a distant acquaintance. Based on the evidence provided the court at this stage does not have sufficient information about the instances and relationship between plaintiff and the identified black students to meaningfully weigh the congeniality and intimacy of these relationships[27] in order to determine if any constitutional protection exists under the First Amendment right of association.

---

[27]  The court uses the term "intimacy" in its broader sense to describe great familiarity or a very close association and not to necessarily denote any romantic or sexual involvement.

However, after reviewing the reasoning by the Supreme Court and that of the Eleventh Circuit in <u>Wilson</u>, the court is unwilling to conclude as a matter of law under the facts known that no First Amendment protection exists.

For the foregoing reasons, defendant Limestone's motion for summary judgment as to plaintiff's § 1983 claim is due to be denied in relation to any deprivation of a First Amendment right of association.

## D.   <u>Qualified Immunity in Relation to Plaintiff's § 1983 Claims Against Pettus and Davis</u>

Now the court must turn to the motion for summary judgment on plaintiff's § 1983 claims against Pettus and Davis, individually.  The Eleventh Circuit has emphasized the importance of recognizing qualified immunity as a protection designed to allow government officials to avoid the expense and disruption of trial.  <u>Ansley v. Heinrich</u>, 925 F.2d 1339, 1345 (11th Cir. 1991). Qualified immunity is a protection from liability when a government official is performing a discretionary function and his actions did not violate clearly established statutory or constitutional rights that are sufficiently clear to allow a reasonable official to understand that what he is doing violates that right.  <u>Lancaster v. Monroe County, Alabama</u>, 116 F.3d 1419, 1424 (11th Cir. 1997); <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987).  The very action in question need not be held unlawful, but in the light of pre-existing law the unlawfulness must be apparent.  <u>Anderson</u>, 483 U.S. at 640 (other citations omitted).

37

There appears to be no dispute in this case that the alleged

unlawful actions by Pettus and Davis were discretionary in

nature.[28]   Therefore, the question of qualified immunity will

rest on the determination of whether the alleged actions by

Pettus and Davis violate clearly established law.

> For the law to be clearly established to the point that
> qualified immunity does not apply, the law must have
> earlier been developed in such a concrete and factually
> defined context to make it obvious to all reasonable
> government actors, in the defendant[s]' place, that
> "what he is doing" violates federal law. . . "For
> qualified immunity to be surrendered, pre-existing law
> must dictate, that is, truly compel (not just suggest
> or allow or raise a question about), the conclusion for
> every like-situated, reasonable government agent that
> what defendant is doing violates federal law in the
> circumstances."

Lassiter v. Alabama A&M Univ., 28 F.3d 1146, 1149-50 (11th Cir.

1994)(en banc) (other citations omitted).

The Eleventh Circuit appears to recognize three avenues for

plaintiffs to meet this burden. The first avenue is applicable

to most cases. "To overcome this immunity, Plaintiff has the

burden of pointing to case law which 'predate[s] the offic[ial]'s

alleged improper conduct, involve[s] materially similar facts,

and truly compel[s] the conclusion that the plaintiff had a right

under federal law.'" Santamorena v. Georgia Military College, 147

---

[28]   In order for an official to establish that the act was
within one's discretionary authority, an official must show that
the acts (1) were undertaken pursuant to the performance of his
duties and (2) were within the scope of his authority.   Jordon v.
Doe, 38 F.3d 1559, 1566 (11th Cir. 1994).   Based on the language
in the Student Handbook these acts were taken while Pettus and
Davis were performing their duties and such action would be
within their scope of authority.   See Plaintiff's Ex. M, p.29 &
33.

F.3d 1337, 1340 (11th Cir. 1998)(*quoting* <u>Ensley v. Soper</u>, 142
F.3d 1402, 1406 (11th Cir. 1998)).  Alternatively, there may be
exceptional cases where "the words of a federal statute or
federal constitutional provision will be specific enough to
establish the law applicable to particular circumstances clearly
and to overcome qualified immunity even in the absence of case
law." <u>Santamorena v. Georgia Military College</u>, 147 F.3d 1337,
1340, n.6. (11th Cir. 1998)(quoting <u>Lassiter v. Alabama A&M</u>
<u>University</u>, 28 F.3d 1146, 1149 (11th Cir. 1994)(en banc)).
Finally, there may also be exceptional cases where "a general
constitutional rule already identified in the decisional law
[applies] with obvious clarity to the specific conduct in
question." <u>Santamorena</u>, 147 F.3d at 1340,n.6 (quoting <u>United</u>
<u>States v. Lanier</u>, 520 U.S. 259 (1997)).

     "In this circuit, the law can be ʻclearly establishedʼ for
qualified immunity purposes only by decisions of the U.S. Supreme
Court, Eleventh Circuit Court of Appeals, or the highest court of
the state where the case arose." <u>Jenkins v. Talladega City Bd.</u>
<u>Of Educ.</u>, 115 F.3d 821, 827, n.4 (11th Cir.), <u>cert. denied</u>, ____
U.S. ___, 118 S. Ct. 412 (1997).  This court found no clear
binding case law on point from the Eleventh Circuit.   The
plaintiff generally relies on the Supreme Court precedents
abolishing the segregation of schools as clearly establishing the
law by way of the third avenue listed above.  According to
plaintiff <u>Brown v. Board of Education</u>, 347 U.S. 483 and <u>Brown II</u>,
349 U.S. 294 (1955) have identified with obvious clarity that

segregating students according to race in schools is
unconstitutional and unlawful under federal statutes.

There is no doubt that these and subsequent cases clearly
establish that segregating students according to race in separate
educational facilities is a violation of the equal protection
clause.   In fact, the Supreme Court stated that in an area with a
historic state-enforced dual school system "the first remedial
responsibility of school authorities is to eliminate invidious
racial distinctions" with respect to certain areas including
extracurricular activities.   Swann v. Charlotte-Mecklenburg Bd.
of Educ., 402 U.S. 1, 18 (1971).   Then the Supreme Court noted
that "[n]o more than this may be necessary."   Swann, 402 U.S. at
18.

The question for the court is whether these cases clearly
establish that conduct, such as the alleged actions of Pettus and
Davis, violates plaintiff's equal protection rights. While there
can be no doubt that clear racial distinctions for participation
in extracurricular activities have been clearly established to be
in violation of the constitution, plaintiff's complaint does not
reach to the level of these type of allegations.   The allegations
in plaintiff's complaint assert discouragement of interracial
associations between plaintiff and black students but not true
racial distinctions in extracurricular activities.[29]   Although

---

[29]   At first glance plaintiff appears to be asserting that
he was denied access to a school dance because he was accompanied
by a black male student, Tavaris Graves.   See Curt Bentley
Affidavit ¶ 7.   However, plaintiff testified that Pettus actually
told he and Graves to go out **and then come back in.**   Id.

40

the actions alleged appear to cut against the spirit and eventual goals of school desegregation, they address only the social or less formal interaction of students where the school official's constitutional duties are not as well defined.

Similarly, due to the unchartered territory under the First Amendment freedom of association this basis does not provide an alternative with clearly established law.[30]  As explained above, while the Supreme Court in Roberts and Board of Directors of Rotary Int'l provides some factors that may weigh in favor of constitutional protection in this case, there is no binding case law applying these factors to a similar factual setting.  The closest factual setting discovered, Wilson v. Taylor, 733 F.2d 1539 (11th Cir. 1984), was prior to these Supreme Court decisions and the general nature of the court's language in Wilson does not go far enough to clearly establish the law in this area.

In other words, controlling case law does not appear to have adequately addressed this factual context in a concrete and defined manner.  It would appear that good judgment, common sense and genuine courtesy to others would preclude someone from acting in this manner.  In the proper setting similar conduct might be unconstitutional.  However, the law is not clearly established in a manner that the unlawfulness of such actions would be apparent

---

[30]  Although it is not binding the Eighth Circuit held that the issue of whether or not associations with friends and acquaintances are sufficiently intimate to be entitled to the constitutional protection of the freedom of association is not clearly established.  Vieira v. Presley, 988 F.2d 850, 853 (8th Cir. 1993).

41

to an objectively reasonable person acting in the position of
Pettus and Davis. Defendants Pettus and Davis are entitled to
qualified immunity as to plaintiff's § 1983 claim, the only
remaining claim against these individual defendants.

### E. Availability of Injunctive Relief Against the Board

In the amended complaint, plaintiff requests that the court
"[e]njoin the Defendants from carrying out their illegal policy
of discouraging white and black association among students at
Elkmont High School." See Amended Complaint, Prayer for Relief
at ¶ 3. This equitable relief "is unavailable absent a showing
of irreparable injury, a requirement that cannot be met where
there is no showing of any real or immediate threat that the
plaintiff will be wronged again." City of Los Angeles v. Lyons,
461 U.S. 95, 111 (1983); Jackson v. Motel 6 Multipurpose, Inc.,
130 F.3d 999, 1007 (11th Cir. 1997). "Past exposure to illegal
conduct does not itself show a present case or controversy
regarding injunctive relief . . .if unaccompanied by any
continuing, present adverse effects." O'Shea v. Littleton, 414
U.S. 488, 495-96 (1974).

The undisputed facts demonstrate that plaintiff is no longer
a student at Elkmont and has not been enrolled there for over a
year. Plaintiff has failed to come forth with evidence to
support a sufficient likelihood that he will again attend school
at Elkmont and be subject to actions by Pettus and Davis that
discourage interracial associations.

42

Even if plaintiff were to argue that his claim should be considered because it is capable of repetition, yet evades review his argument still falters. As the Supreme Court recognized in Lyons plaintiff's claim does not evade review because he continues to pursue a claim for damages under § 1983 against the Board. 461 U.S. at 109. Based on the foregoing, defendants' motion for summary judgment in relation to plaintiff's request for injunctive relief is due to be granted. A separate order will be entered.

## F. **Rule 54(b) Considerations**

After considering the interest of judicial economy and equitable concerns, the court concludes that there is no just reason to delay the appeal of the decisions set forth in the accompanying order. Pursuant to Rule 54(b), the court directs the clerk to treat the accompanying order as a final judgment on plaintiff's Title VI claim, on his § 1983 claim based on a deprivation of his equal protection right by the Limestone County Board of Education and on his § 1983 claims against defendants Pettus and Davis.

These rulings center around several unsettled legal issues: (1) whether the reasoning in Gebser is equally applicable to Title VI cases; (2) how potential final policymaking authority affects the Gebser reasoning; and (3) whether there is a constitutional duty in relation to segregation in social settings while at school or attending school-related functions. If this

43

court is in error on any of these issues, a remand following a jury trial on the remaining § 1983 claim would be duplicative and an inefficient use of judicial resources due to the identical nature of the factual evidence and the necessary presentation of the totality of the circumstances in order to present any of plaintiff's claims to a jury.  Due to the coherent nature of the legal issues underlying the court's decision to grant summary judgment on these issues, they do not appear to unreasonably present piecemeal appeals. Furthermore, the equity considerations in this case weigh in favor of allowing plaintiff to present all appropriate claims to a jury at one time in order to allow a full factual development of the situation and if appropriate, to allow a jury the right to assess liability in the best appropriate manner.

DONE this 30th day of September, 1998.

_____

SENIOR UNITED STATES DISTRICT JUDGE

44